## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 05 B 14742 |
| | ) | Chapter 7 |
| DON JOSEPH ZORDAN, | ) | Judge John H. Squires |
| | ) | |
| Debtor. | ) | |
| | ) | |
| CONNEL JABAMONI, | ) | Adversary No. 05 A 01711 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DON JOSEPH ZORDAN, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by Connel Jabamoni ("Jabamoni") which seeks to except a debt owed by Don Joseph Zordan (the "Debtor") from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). For the reasons set forth herein, the Court grants judgment in favor of Jabamoni and finds that the debt owed by the Debtor to Jabamoni in the liquidated sum of $160,025.36 for actual damages is non-dischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6). In addition, the Court finds that punitive damages in the amount of $98,000.00 as well as pre-judgment and post-judgment interest are non-dischargeable.

-2-

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. FACTS AND BACKGROUND

Previously, the Court issued a Memorandum Opinion in this matter wherein it denied Jabamoni's motion for summary judgment and set this adversary proceeding for trial. *Jabamoni v. Zordan (In re Zordan)*, Bankr. No. 05 B 14742, Adv. No. 05 A 01711, 2006 WL 220111 (Bankr. N.D. Ill. Jan. 26, 2006). In that Opinion, the Court set forth the undisputed facts as well as the applicable standards. *Id.* at *4-6. Those facts and standards are incorporated here by reference. A trial was held on May 5 and 19, 2006. Both the Debtor and Jabamoni testified. Thereafter, the Court took the matter under advisement.

Briefly, the Court will summarize the pertinent facts as set forth in its previous Memorandum Opinion. Prior to 1996, the Debtor and Jabamoni entered into an agreement (the "Agreement") to rehabilitate real estate and sell it for a profit. *Id.* at *4. Under the Agreement, Jabamoni was required to provide the Debtor with the money necessary to purchase and renovate the properties targeted for rehabilitation. *Id.* The Debtor's duties consisted of supervising the rehabilitation process and the eventual sale. *Id.* Once the property was sold, the proceeds were to first be used to reimburse Jabamoni for any money he provided the Debtor to purchase and rehabilitate the property. *Id.* The remaining net

-3-

proceeds were to be divided equally between Jabamoni and the Debtor. *Id.* In accordance with the terms of the Agreement, Jabamoni paid $163,578.27 to the Debtor. *Id.*

After the parties entered into the Agreement, the Debtor performed a series of acts that allegedly violated the terms of the Agreement. *Id.* The Debtor placed title to real estate purchased with monies provided by Jabamoni into Illinois land trust accounts such that the beneficiaries were entities under the control of the Debtor, not Jabamoni. *Id.* He also misrepresented and concealed from Jabamoni the fact that he had received proceeds from the sale of certain real estate that was subject to the Agreement. *Id.* Unknown to Jabamoni, the Debtor placed these proceeds in a concealed bank account unrelated to the parties' business enterprise and under the Debtor's sole control. *Id.* The Debtor also asserted a claim against the proceeds for the payment of a fee that was not provided for in the Agreement. *Id.*

Jabamoni filed a lawsuit against, *inter alia*, the Debtor in the Illinois State court. *Id.* After a trial, the state court issued an order on November 30, 1998, that found in favor of Jabamoni on the breach of fiduciary duty and constructive trust causes of action. (*Id.*; Jabamoni Ex. No. 33.) A second trial was held on the issue of punitive damages. *Zordan*, 2006 WL 220111, at *5. An order was issued on May 10, 1999, which directed the Debtor to pay Jabamoni punitive damages in the sum of $98,000.00. (*Id.*; Jabamoni Ex. No. 34.)

On April 18, 2005, the Debtor filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code. *Zordan*, 2006 WL 220111, at *6. Jabamoni filed the instant adversary proceeding on August 5, 2005, wherein he alleges that the state court judgments issued against the Debtor are excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6). (*Id.*; Jabamoni Ex. No. 30.) According to Jabamoni's calculations, the Debtor

-4-

was indebted to Jabamoni in the amount of $407,074.54 ($163,578.27 in actual damages;

$98,000.00 in punitive damages; and $145,496.27 in post-judgment interest) which was

unpaid as of the petition filing date. *Zordan*, 2006 WL 220111, at *6.

The Court makes the following additional findings of fact based on the Debtor's

failure to properly answer the complaint,[1] his admission of several of the requests to admit,[2]

and the testimony adduced at trial. Jabamoni immigrated to the United States in 1966 and

became a citizen in 1987. Jabamoni testified that he worked as a chemist at several Illinois

electronic manufacturing companies. In 1983, Jabamoni and two colleagues formed a

manufacturing company which they sold in 1988. Jabamoni stated that he worked as a

chemist for that company prior to its sale in 1988.

The Debtor earned a bachelor's degree and a master's degree in economics from the

University of Illinois in 1968 and 1971, respectively. (Jabamoni Ex. Nos. 40 & 41, Requests

to Admit No. 16.) In 1974, the Debtor earned a master's degree in marketing from the

---

[1] The Debtor answered the complaint, but failed to file that answer with the Court. (Jabamoni Ex. No. 31.) The Court found that the Debtor admitted the allegations in the complaint. *Zordan*, 2006 WL 220111, at *6 n.7.

[2] The requests to admit were served on the Debtor on March 17, 2006. (Jabamoni Ex. No. 40.) The Debtor responded on April 17, 2006. (Jabamoni Ex. No. 41.) The Debtor is deemed to have admitted, for purposes of the trial in this matter, those facts set forth in the requests to admit that he admitted in his response. *See* FED. R. CIV. P. 36(a). Specifically, the Debtor admitted the following numbered requests to admit: 5, 13, 14, 16-23, 30, 31, 34, 36, 45, 49, 50, 52-57, 59, 60, 62, 63, 67-74, 76, 77, 79, 83-86, 90-92, 99, 101-103, 106-113, 115-124, 129, 130, 133, 142, 144, 146-148, 150, 153, & 154. (Jabamoni Ex. No. 41.) The Court notes that Jabamoni's requests to admit are numbered 51 then 53 and skip number 52.

The purpose of Rule 36(a) is to expedite the trial by eliminating the need to prove undisputed issues. *Kosta v. Connolly*, 709 F. Supp. 592, 594 (E.D. Pa. 1989). "Admissions under Rule 36 stand in the same relation to the case that sworn evidence bears." *Dorsey v. Reconstruction Fin. Corp.*, 197 F.2d 468, 472 (7th Cir. 1952).

-5-

University of Chicago. (*Id.* Requests to Admit No. 17.) The Debtor worked for Continental Illinois National Bank as a systems analyst from 1969 to 1972. (*Id.* Requests to Admit No. 18.) Thereafter, from 1972 to 1974, the Debtor was employed by Hewlett Packard initially as a systems analyst and then as an information systems manager. (*Id.* Requests to Admit No. 19.) Subsequently, the Debtor worked for an Illinois company, Reynolds Securities, as a stock broker from 1974 to 1979. (*Id.* Requests to Admit No. 20.) From 1979 to 1985, the Debtor was self-employed as a financial planner in Chicago, Illinois. (*Id.* Requests to Admit No. 21.) The Debtor then was employed from 1985 to 1990, as a general manager of a business which owned a tune-up shop, a trucking company, and a mini-mart. (*Id.* Requests to Admit No. 22.) That business was located in Dubois, Wyoming. (*Id.*) In February 1991, the Debtor moved back to Chicago and worked for the Federal Deposit Insurance Corporation. (*Id.* Requests to Admit No. 23.) There, he spent one year liquidating real estate that had been repossessed from failed lending institutions. (*Id.*) The Debtor testified that in March of 1992, he was employed by Easy Life Real Estate ("Easy Life"). According to the Debtor, his duties at Easy Life included rehabilitating residential real properties that Easy Life had purchased.

On September 24, 1992, the Debtor incorporated an Illinois company named Brownstone Development Corporation ("Brownstone"). (Jabamoni Ex. Nos. 1, 40, & 41, Requests to Admit Nos. 30 & 31.) Brownstone never had any employees or a payroll. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 34.) At all relevant times, the Debtor

-6-

was the sole shareholder and corporate officer of Brownstone.[3]  (*Id.* Requests to Admit No. 63.)

In July 1994, the Debtor learned from his uncle that Jabamoni might be interested in investing in real estate. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 5.) Thereafter, according to Jabamoni, he and the Debtor began their initial discussions which eventually resulted in the Agreement. Jabamoni testified that in a phone conversation he had with the Debtor, the Debtor stated that he owned a real estate "rehab company" and that he wanted to meet with Jabamoni to discuss real estate investment. At the time of this conversation, however, the Debtor did not own a real estate "rehab company," or any company that was then actively engaged in the business of buying or rehabilitating real estate. Jabamoni testified that after that initial phone call, the Debtor and Jabamoni met at Jabamoni's home. At this meeting, the Debtor proposed to Jabamoni the terms of the Agreement. The Debtor admitted that under the Agreement, Jabamoni was a passive investor who was responsible for providing capital that would be used to purchase, rehabilitate, and maintain the real property that the Debtor and Jabamoni purchased.  (*Id.* Requests to Admit No. 133.) According to Jabamoni, the Debtor told him that he had been in the business of rehabilitating real estate for more than fifteen years.[4]  The Debtor further admitted that Jabamoni

---

[3] On February 1, 1995, Brownstone was involuntarily dissolved for nonpayment of Illinois franchise taxes. (Jabamoni Ex. Nos. 2, 40, & 41, Requests to Admit No. 36.)

[4] At the trial, the Debtor denied that he told Jabamoni that he had fifteen years of experience in the business of rehabilitating real estate. Thus, the testimony on this point is in conflict. The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear

-7-

reasonably relied on his statements regarding his background, his companies, and his qualifications and experience in the business of rehabilitating real property. (*Id.* Requests to Admit No. 45.)

According to Jabamoni, he discussed with the Debtor how the property that they were going to purchased would be titled. Jabamoni told the Debtor that he wanted the property titled in his name. Jabamoni testified that the Debtor told him that placing the properties in land trusts would protect Jabamoni from any potential liability associated with holding title to the properties. He stated that the Debtor assured him that he would make Jabamoni the beneficiary of the land trusts. Jabamoni testified that he had little or no experience with land trusts. Specifically, he lacked the understanding of how land trusts worked, how one was created, or what was necessary in order to make a person the beneficial owner of the trust.

In August of 1994, the Debtor and Jabamoni drove through a Chicago residential neighborhood wherein they saw a residence for sale which was located at 1816 South St. Louis, Chicago, Illinois (the "St. Louis Property"). (*Id.* Requests to Admit No. 49.) They agreed to purchase the St. Louis Property and rehabilitate it pursuant to the terms of the Agreement. (*Id.* Requests to Admit No. 50.) On September 1, 1994, the Debtor submitted an offer to Steven Rothman, the owner of record, to purchase the St. Louis Property. (Jabamoni Ex. Nos. 3, 40, & 41, Requests to Admit No. 53.) The Debtor listed Brownstone rather than Jabamoni as the proposed purchaser of that property. (*Id.*) On September 9,

---

so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dept. of Health & Social Servs.*, 838 F.2d 944, 946 (7th Cir. 1988) (*citing Anderson*). The Court finds Jabamoni's testimony on this point more credible than that of the Debtor's testimony. The Debtor was impeached several times during his trial examination by prior inconsistent deposition testimony.

-8-

1994, Jabamoni gave the Debtor a check in the amount of $1,650.00 which was used as an earnest money deposit for the purchase of the St. Louis Property. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 54.) Thereafter, on December 12, 1994, Jabamoni gave the Debtor a cashier's check payable to S. Rothman in the amount of $14,949.00 which was used by the Debtor to complete the purchase of the St. Louis Property. (*Id.* Request to Admit No. 55.) On December 22, 1994, the Debtor closed the purchase of the St. Louis Property and caused the seller to issue a deed to that property to the American National Bank and Trust Company of Chicago, not individually, but as trustee of trust number 119846-06 (the "St. Louis Trust"). (Jabamoni Ex. Nos. 4, 5, 40, & 41, Requests to Admit Nos. 56 & 57.)

Jabamoni testified that he did not attend the closing of the St. Louis Property. The Debtor admitted that Jabamoni reasonably relied on him to place title to the St. Louis Property in a land trust in which Jabamoni was the beneficial owner. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 59.) On the date the St. Louis Trust took title to the St. Louis Property, Brownstone, rather than Jabamoni, was the sole beneficial owner of the St. Louis Trust. (*Id.* Requests to Admit No. 60.) The Debtor never informed Jabamoni that Brownstone was the beneficial owner of the St. Louis Trust. (*Id.* Requests to Admit No. 62.) The Debtor admitted that he intentionally breached the Agreement when he conveyed the St. Louis Property into the St. Louis Trust. (*Id.* Requests to Admit No. 67.)

On December 7, 1994, the Debtor sent Jabamoni a facsimile concerning another residence for sale which was located at 4252 North Central Park, Chicago, Illinois (the "Central Park Property"). (Jabamoni Ex. Nos. 6, 40, & 41, Requests to Admit No. 68.) Shortly thereafter, they agreed to buy the Central Park Property and to rehabilitate it pursuant

-9-

to the terms of the Agreement. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 69.)

On December 8, 1994, the Debtor submitted an offer to purchase the property. (Jabamoni

Ex. Nos. 7, 40, & 41, Requests to Admit No. 70.) As was the case with the St. Louis

Property, the Debtor listed Brownstone as the proposed purchaser of the Central Park

Property rather than Jabamoni. (*Id.*) Jabamoni gave the Debtor a check payable to Mary C.

Fahey in the amount of $5,000.00, which was used by the Debtor as an earnest money

deposit on the Central Park Property. (*Id.* Requests to Admit No. 71.) On December 13,

1994, Jabamoni gave the Debtor a cashier's check payable to Mary Fahey in the amount of

$60,000.00, which was used to purchase the Central Park Property. (*Id.* Requests to Admit

No. 72.) Thereafter, on December 22, 1994, the Debtor closed the purchase of the Central

Park Property and caused the seller to issue a deed to that property to American National

Bank and Trust Company of Chicago, not individually, but as trustee of trust number

119847-05 (the "Central Park Trust"). (Jabamoni Ex. Nos. 8, 9, 40, & 41, Requests to Admit

Nos. 73 & 74.)

Jabamoni testified that he did not attend the closing of the Central Park Property. On

the date that the Central Park Trust took title to the Central Park Property, Brownstone, rather

than Jabamoni, was the sole beneficial owner of the Central Park Trust. (Jabamoni Ex. Nos.

40 & 41, Requests to Admit No. 76.) The Debtor admitted that he caused the Central Park

Property to be conveyed into the Central Park Trust as part of an intentional scheme to

defraud Jabamoni. (*Id.* Requests to Admit No. 83.) The Debtor also admitted that he

intentionally breached the Agreement when he caused the Central Park Property to be

conveyed into the Central Park Trust. (*Id.* Requests to Admit No. 84.)

-10-

On May 23, 1995, the Debtor created an Illinois corporation named All-American Remodeling, Inc. ("All-American").[5] (Jabamoni Ex. Nos. 10, 40, & 41, Requests to Admit No. 85.)  The Debtor was the sole incorporator and registered agent of All-American. (Jabamoni Ex. Nos. 10, 40, & 41, Requests to Admit No. 86.)  On July 7, 1995, the Debtor, as president and secretary of Brownstone, signed a document which assigned one hundred percent of the beneficial interest in the St. Louis Trust from Brownstone to All-American. (Jabamoni Ex. No. 11.)  The Debtor also signed that document as president and secretary of All-American.  (*Id.*)  On July 7, 1995, the Debtor, as president and secretary of All-American, signed a document that assigned one hundred percent of the beneficial interest in the Central Park Trust from Brownstone to All-American.  (Jabamoni Ex. No. 12.)  The Debtor also signed that document in his capacity as president and secretary of All-American. (*Id.*)

The Debtor admitted that he intentionally breached the Agreement with the intent to cheat Jabamoni, or to make it easier for him to cheat Jabamoni at a later date, when he caused Brownstone to assign its beneficial interest in the St. Louis Trust and the Central Park Trust to All-American. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 90.)  Further, the Debtor admitted that when he caused Brownstone to assign its beneficial interest in the St. Louis Trust and the Central Park Trust to All-American, this was an act to further and advance his scheme to defraud Jabamoni out of the funds that Jabamoni had entrusted to him pursuant to the Agreement. (*Id.* Requests to Admit No. 91.)

---

[5]  On August 17, 1995, the Debtor changed All-American's name to Amazing Impressions, Inc. ("Amazing Impressions") (Jabamoni Ex. Nos. 13, 40, & 41, Requests to Admit No. 92.)

-11-

On February 10, 1996, unknown to Jabamoni, the Debtor (on behalf of Amazing Impressions) received a written offer from Phillip Sharkan as trustee, to purchase the Central Park Property for the sum of $58,000.00. (Jabamoni Ex. No. 15.) Jabamoni testified that the Debtor never informed him that an offer to purchase the Central Park Property had been made. On March 8, 1996, the Debtor sent Jabamoni a letter via facsimile that informed Jabamoni that the Debtor had listed the Central Park Property for sale, that additional work needed to be done to the St. Louis Property, and that the Debtor need additional funds to pay for the necessary work. (Jabamoni Ex. No. 16.) On March 16, 1996, unknown to Jabamoni, the Debtor received a second written offer in the amount of $68,500.00 from Phillip Sharkan as trustee, to purchase the Central Park Property. (Jabamoni Ex. No. 17.) The Debtor, on behalf of Amazing Impressions, accepted this second offer. (*Id.*; Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 99.)

On April 16, 1996, unknown to Jabamoni, the Debtor caused the Central Park Trust to close the sale of the Central Park Property to Albany Bank and Trust Co., N.A., as trustee under the provisions of a trust agreement dated April 8, 1996, and known as trust number 11-5198.[6] (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 101.) The Debtor was issued a check on April 16, 1996 in the sum of $49,980.40 at the closing of the sale of Central Park Property. (Jabamoni Ex. No. 21.) On that same date, the Debtor was also issued a check in the amount of $2,740.00 from Salamanca Realty, which served as the broker in connection with the sale of the property. (*Id.*) The Debtor admittedly did not notify Jabamoni or obtain

---

[6] On April 16, 1996, the beneficial owners of the Albany Bank trust were Phillip Sharkan and his wife, Melinda Sharkan. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 102.)

-12-

his consent to the payment of any brokerage fee to the Debtor in connection with the sale of the Central Park Property. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 106.) The Debtor acknowledged that he intended to defraud Jabamoni when he arranged for himself to receive the brokerage fee and when he accepted that fee in connection with the sale of the Central Park Property. (*Id.* Requests to Admit No. 107.)

In April of 1996, and for a time thereafter, Amazing Impressions maintained an account with West Suburban Bank in Lombard, Illinois (the "Amazing Impressions Account"). (*Id.* Requests to Admit No. 108.) At all relevant times, the Debtor was the sole signatory on that account and in control of Amazing Impressions. (Jabamoni Ex. Nos. 19, 40, & 41, Requests to Admit Nos. 109 & 110.) On April 19, 1996, the Debtor deposited the $49,980.40 and $2,740.00 checks into the Amazing Impressions Account. (Jabamoni Ex. Nos. 20, 21, 40, & 41, Requests to Admit Nos. 111 & 113.) On May 28, 1996, the title company that closed the sale of the Central Park Property issued a check to the Debtor in the sum of $2,061.83. (Jabamoni Ex. Nos. 23, 40, & 41, Requests to Admit No. 119.) Additionally, on that same date, Salamanca Realty issued a check to Amazing Impressions in the amount of $1,450.00. (*Id.* Requests to Admit No. 115.) Both checks were derived from proceeds of the Central Park Property sale. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 116.) On August 2, 1996, the Debtor deposited those checks into the Amazing Impressions Account. (Jabamoni Ex. Nos. 22, 40, & 41, Requests to Admit Nos. 117 & 118.) The Debtor admitted that he did not apply any of the net proceeds from the sale of the Central Park Property in the manner contemplated by the Agreement. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 129.)

-13-

As of June 10, 1996, Jabamoni paid a total of $88,653.49 for the Central Park Property, which included, *inter alia,* the purchase price, land trust fees, utilities, and amounts paid to workers who were engaged to rehabilitate the property. (Jabamoni Ex. Nos. 24, 40, & 41, Requests to Admit No. 122.)   As of June 10, 1996, Jabamoni paid a total of $74,924.78 for the St. Louis Property, which included, *inter alia,* the purchase price, land trust fees, utilities, and amounts paid to workers who were engaged to rehabilitate the property.  (*Id.* Requests to Admit No. 123.)  The total amount that Jabamoni contributed to the St. Louis Property and the Central Park Property was $163,578.27.  (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 124.)

On November 30, 1998, the state court entered judgment in favor of Jabamoni and against the Debtor in the sum of $163,578.27.  (Jabamoni Ex. No. 33.)  The current amount due and owing Jabamoni with interest calculated and credit given for funds received is $160,025.36.  (Jabamoni Ex. No. 29.)

## III.  DISCUSSION

### A.    11 U.S.C. § 523(a)(2)(A)

In its prior Memorandum Opinion, the Court set forth the applicable standards with respect to § 523(a)(2)(A).  *Zordan,* 2006 WL 220111, at *8.  Those standards are incorporated here by reference.  The Court finds that the preponderance of the credible evidence adduced at trial and the Debtor's admissions show that the Debtor intended to defraud Jabamoni at the time they entered into the Agreement to rehabilitate real estate and sell it for a profit.  Jabamoni testified that the Debtor told Jabamoni that he had fifteen years

-14-

of experience in the rehabilitation business and owned several companies. Indeed, this statement was not true. Moreover, the Debtor misrepresented to Jabamoni that he would place the real estate that they purchased in land trusts and make Jabamoni the beneficiary of those land trusts. While the Debtor did in fact place the St. Louis Property and the Central Park Property into land trusts, he made his company, Brownstone, the beneficiary of those land trusts. The Debtor admitted that he never intended to make Jabamoni the beneficial owner of either of those land trusts. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit No. 13.) Significantly, the Debtor acknowledged that when he designated Brownstone the beneficial owner of the St. Louis Trust and the Central Park Trust, rather than Jabamoni, he placed himself in a position to cheat and defraud Jabamoni upon the later sale of the res of those trusts. (*Id.* Requests to Admit No. 142.)

Furthermore, the Debtor made several misrepresentations to Jabamoni concerning the receipt of certain sale proceeds from the Central Park Property. Specifically, the Debtor failed to tell Jabamoni that he had sold the Central Park Property and that he had received proceeds from that sale. Additionally, the Debtor admitted that he did not apply any of the net proceeds from the sale of the Central Park Property in the manner contemplated by the Agreement. (*Id.* Requests to Admit No. 129.)

In sum, the Court finds that the Debtor's admissions to pertinent requests to admit, his misrepresentation about his experience and background, his failure to make Jabamoni the beneficial owner of the land trusts, and his failure to inform Jabamoni about the sale of the Central Park Property and what he did with those sale proceeds, were statements and actions made by the Debtor to "gain an advantage over [Jabamoni] by false suggestions or by the

-15-

suppression of truth." *See McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). Hence, the Court finds that Jabamoni has established by a preponderance of the evidence that the Debtor possessed the intent to defraud him. Thus, the Court grants judgment in favor of Jabamoni and finds that the debt is non-dischargeable under § 523(a)(2)(A).

**B.    11 U.S.C. § 523(a)(4)**

In its previous Memorandum Opinion, the Court set forth the applicable standards with respect to § 523(a)(4). *Zordan*, 2006 WL 220111, at *10-11. Those standards are incorporated here by reference.

The Debtor and Jabamoni embarked on a joint venture in the rehabilitation of real estate. Even though the Agreement was not specifically styled a joint venture, the parties operated as if they were involved in such an arrangement. While participants in a joint venture owe one another a fiduciary obligation, *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996) (citing Illinois law); *Couri v. Couri*, 447 N.E.2d 334, 337 (Ill. 1983), the Seventh Circuit in *In re Marchiando*, 13 F.3d 1111 (7th Cir. 1994), made it clear that only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge of the debt and against the creditor resisting that discharge come with the purview of § 523(a)(4). *Id.* at 1116.

The Court finds that the Debtor was in a position of ascendency over Jabamoni and, thus, a fiduciary relationship existed. Indeed, there was a significant and substantial difference in knowledge and power between the Debtor and Jabamoni. The Debtor had a master's degree in economics and a master's degree in marketing, as well as prior experience in the business of real estate rehabilitation and sales. Jabamoni, on the other hand, was a

-16-

naturalized citizen with no experience in the real estate rehabilitation industry. Moreover, the Debtor had assumed power to acquire and dispose of the St. Louis Property and the Central Park Property that were purchased with Jabamoni's money pursuant to the Agreement. Thus, a fiduciary relationship existed between the Debtor and Jabamoni because of the imbalance in the duties and responsibilities under the Agreement, as well as the difference of knowledge and power between the two parties. Jabamoni reposed a special confidence in the Debtor to perform his duties and responsibilities under the Agreement, including, *inter alia*, the Debtor's promise to make Jabamoni the beneficial owner of the St. Louis Trust and the Central Park Trust, and to deal with the St. Louis Property and the Central Park Property in a manner as specified by the Agreement–not to convert money for his own purposes that was entrusted to the Debtor pursuant to the Agreement.

In short, a fiduciary obligation existed prior to the alleged wrongdoing by the Debtor. Hence, the evidence at trial established that a fiduciary relationship existed between the Debtor and Jabamoni.

Next, the Court finds that the Debtor engaged in acts of defalcation while acting within the capacity of a fiduciary. Jabamoni testified that the Debtor told him that he had fifteen years of experience in the rehabilitation business and owned several companies, which as the Court noted *supra* was not true. As the Court previously found, the initial relationship between the Debtor and Jabamoni was premised on misrepresentations made by the Debtor with respect to his background and experience in real estate rehabilitation and sales. Moreover, the Debtor did not remit the sale proceeds from the Central Park Property to Jabamoni and failed to pay him for his expenses and acquisition costs pursuant to the

-17-

Agreement. Instead, the Debtor misrepresented and concealed the fact that proceeds had been received from the sale of the Central Park Property. Further, the Debtor told Jabamoni that he would make him the beneficiary of the land trusts, but never did so. The Debtor knowingly committed a defalcation while in a fiduciary capacity when he designated Brownstone (and later All-American) as the beneficial owner of the St. Louis Trust and the Central Park Trust. In addition, the Debtor engaged in defalcation when he sold the Central Park Property without Jabamoni's knowledge and consent and deposited the proceeds from that sale into the Amazing Impressions Account.

In sum, the Court finds that Jabamoni established by a preponderance of the evidence a fiduciary relationship between him and the Debtor and a debt caused by the Debtor's defalcation while acting as a fiduciary. Accordingly, the Court finds that the debt owed by the Debtor to Jabamoni is non-dischargeable pursuant to § 523(a)(4).

**C.     11 U.S.C. § 523(a)(6)**

In its prior Memorandum Opinion, the Court set forth the applicable standards with respect to § 523(a)(6). *Zordan*, 2006 WL 220111, at *12. Those standards are incorporated here by reference. The Court finds that Jabamoni proved by a preponderance of the evidence that the Debtor actually intended to harm him financially. The Court also finds that Jabamoni established that the Debtor's actions were intentional (and not merely negligent or reckless), that he intended to injure Jabamoni's property interests and cause him harm at the time of the wrongful conduct, and that the Debtor's actions were both willful and malicious. Specifically, the relationship between Jabamoni and the Debtor began with misrepresentations made by the Debtor with respect to his experience in the real estate

-18-

industry as well as his alleged "rehab" companies, all of which were intended, without just cause, to mislead Jabamoni into thinking that the Debtor would be a knowledgeable and trustworthy partner in the real estate investments that they proposed to make. Further, the Debtor knowingly placed the real estate that he and Jabamoni purchased into land trusts and made the companies he controlled the beneficial owners rather than Jabamoni. This action was in direct contradiction to what he told Jabamoni he would do.

The Debtor admitted that he intentionally breached the Agreement when he conveyed the St. Louis Property into the St. Louis Trust and the Central Park Property into the Central Park Trust and Brownstone held the beneficial interest in those trusts. (Jabamoni Ex. Nos. 40 & 41, Requests to Admit Nos. 67 & 84.) Further, the Debtor acknowledged that he caused the Central Park Property to be conveyed into the Central Park Trust as part of an intentional scheme to defraud Jabamoni. (*Id.* Requests to Admit No. 83.) Finally, the Debtor admitted that when he caused Brownstone to assign the beneficial ownership of the St. Louis Trust and the Central Park Trust to All-American, that was an overt act on his part to further and advance his scheme to defraud Jabamoni out of the funds that Jabamoni entrusted to the Debtor under the Agreement. (*Id.* Requests to Admit No. 91.) The Court has previously held that a debtor commits a "willful and malicious injury" for purposes of § 523(a)(6) when he sells real property without authority and then converts the proceeds. *See Grynevich v. Grynevich (In re Grynevich)*, 172 B.R. 888, 892-93 (Bankr. N.D. Ill. 1994).

Based upon the evidence, the Court finds that the Debtor intentionally and maliciously harmed Jabamoni's property interests and investments in the St. Louis Property and the Central Park Property when he failed to make Jabamoni the beneficial owner of the

-19-

St. Louis Trust and the Central Park Trust and when he converted the proceeds from the sale of the Central Park Property without repayment to Jabamoni. Accordingly, the Court finds that Jabamoni demonstrated the requisite elements under § 523(a)(6). Hence, the debt is non-dischargeable under § 523(a)(6).

**D.     Punitive Damages**

In the May 10, 1999 order, the state court entered a judgment in favor of Jabamoni and against the Debtor in the sum of $98,000.00 for punitive damages. (Jabamoni Ex. No. 34.) Jabamoni contends that this award of punitive damages as well as the post-judgment interest that has accrued are non-dischargeable.

In an adversary proceeding under 11 U.S.C. § 523(a), the Court has the authority to award punitive or exemplary damages, and such damages are not dischargeable. *See Cohen v. de La Cruz*, 523 U.S. 213, 221 (1998). Moreover, the Seventh Circuit has made it clear that "[b]ankruptcy law enforces non-bankruptcy entitlements, unless they are modified according to the Code." *In re A.G. Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 413-14 (7th Cir. 2005). The Bankruptcy Code does not alter the award of punitive damages. Thus, because the state court awarded Jabamoni punitive damages, the Court finds that those punitive damages are non-dischargeable.

## IV. **CONCLUSION**

For the foregoing reasons, the Court finds that the debt owed by the Debtor to Jabamoni in the liquidated sum of $160,025.36 for actual damages is non-dischargeable under §§523(a)(2)(A), (a)(4), and (a)(6). In addition, the Court finds that punitive damages

-20-

in the amount of $98,000.00 as well as pre-judgment and post-judgment interest are non-dischargeable.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED:**

DATE: _____6/27/6_____

_____
John H. Squires
United States Bankruptcy Judge

cc: See attached Service List

### SERVICE LIST

#### Connel Jabamoni v. Don J. Zordan

**Adversary No. 05 A 01711**

Don J. Zordan
1256 Townes Circle
Aurora, IL 60502

Bruce Dopke, Esq.
P.O. Box 681246
Schaumburg, IL 60168-1246

Brenda Porter Helms
c/o Albany Bank & Trust
3400 W. Lawrence Avenue
Chicago, IL 60625

William T. Neary, United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606